KOHNE *against* The Insurance Company of North America.

THIS was an insurance on goods on board the *Gadsden*, at and from *Newport, Rhode Island*, to *Port Passage* in *October* 1799, on board the ship *Gadsden*, from *Newport, Rhode Island*, to *Passage* in *Spain*. The goods were part of a cargo, which had been imported in the same ship from *Laguira* to *Charleston*, and there by permission of the custom house officers, suffered to remain on board, being entered for exportation and bonds given for the duties. Other goods were then put on board, with which she sailed for *Passage;* but being forced in consequence of an accident to put into *Newport*, the whole cargo was there taken out, and after some repairs was reshipped in the same vessel, which then sailed upon the voyage insured. The order of insurance only mentioned the kind of goods, but nothing was said of the importation from *Laguira*, nor of the circumstances attending the exportation from *Charleston*, although the *British* order of 25th *January* 1798, was then well known in the *United States*.

*Held* 1. That this was a material concealment which avoided the policy.

2. That the underwriters were not bound to enquire into the origin or history of the cargo, in consequence of knowing that the articles insured were such as the *Spanish* colonies produce; but it was the duty of the insured to inform them.

3. That by the true construction of the order of *January* 1798, the *voyage* from the colony to the mother country must be indirect, and not merely the *course* of the voyage: and

4. Whether the importation at *Charleston* was legal or not, it was at least so unusual and suspicious, that it was the duty of the insured to communicate it to the insurer.

*Philadelphia,
Saturday,
January 8th.*
Goods consist-
ing of cocoa, indi-
go, tobacco, &c.,
were insured in

1814.

KOHNE
v.
INS. COMPANY
of
N. AMERICA.

*Spain*, warranted the property of the plaintiff a citizen of the *United States*, proof to be made in *Philadelphia* only. The policy was dated the 12th *October* 1799, and was for 15,400 dollars at 14 per cent. The order of insurance described the property as being cocoa, indigo, sugar, tobacco &c., but gave no other particulars.

The cause was tried before the Chief Justice in *November* last, when contrary to his charge, the jury found a verdict for the plaintiff; and now, upon a motion by the defendants for a new trial, his honour reported the case to be as follows:

The ship *Gadsden*, laden with the goods insured, the property of the plaintiff, an *American* citizen, sailed from *Newport* for *Passage* on the 6th *September* 1799, and on the 10th of the same month was captured by the *British* ship of war *Pheasant*, and carried to *Halifax*, where she was condemned with part of her cargo, including part of the goods insured. The defence relied upon was *concealment*, in reference to which the facts were these. In the beginning of the year 1799, the plaintiff carried in the same ship a cargo of linens &c. from *Charleston* to *Laguira*, which he there sold to the agents of the *Spanish* government; and at *Laguira* and *Porto Caballo*, he received from them in return, and took in, a cargo of cocoa, tobacco, indigo &c., which he carried to *Charleston*. Part of the cargo was there unladen; and part, being entered for exportation, and the duties bonded, was permitted by the custom house officers to be retained on board, as was frequently done there in similar cases. The ship was afterwards cleared out for *Passage*, and sailed with a cargo consisting in part of the cocoa, indigo &c. brought from *Spanish America*, and which had not been taken out of the ship, and in part of other articles shipped at *Charleston*. In going out of the port of *Charleston*, the ship struck on the bar, and suffered considerable injury, in consequence of which she put into *Newport*. The cargo was there taken out, and the vessel being repaired, it was reshipped, and departed upon the voyage insured with the original *Spanish* papers, shewing the origin of part of the cargo. None of these circumstances were made known to the defendants at the time of effecting the insurance; and it

was shewn, that the defendants had asked such premiums as amounted to declining the risks, where there had been an importation without landing. The judge of Vice Admiralty at *Halifax*, by his decree, condemned the ship, and so much of the goods as had not been landed at *Charleston*, and restored the rest.

The Chief Justice submitted it to the jury, whether the defendants ought not to have been informed, that part of the cargo had been brought from *Spanish America* in the *Gadsden*, and not landed at *Charleston*, telling them at the same time, that in his opinion such information was necessary.

*Hopkinson* and *Ingersoll* for the defendants. In this case the jury disregarded the charge and the law; and if they have committed merely an error in fact, yet it being a plain one, the Court will grant a new trial. In *Hoyt* v. *Gilman* (a) the Court said, that if the jury found wrong with regard to a fraudulent concealment, they would order a new trial.

The concealment of facts relative to the importation of the cargo in the same ship, and its not being landed at *Charleston*, was material, these circumstances having greatly increased the risk. On the 25th *January* 1798, the order in council was passed, which directed the *British* cruisers to seize and bring in for adjudication, all ships laden with the produce of *French*, *Spanish*, or *Dutch* colonies, and going *directly* from thence to any port in *Europe*, not *English*, nor the port of that country to which the ship belonged. This order in council was universally known; and if the facts brought this case within it, it was the duty of the assured to communicate them, whether that order or the decisions under it were or were not conformable to the law of nations. *Sperry* v. *Delaware Ins. Co.* (b), *Kohne* v. *Ins. Co. N. A.* (c). The conformity of the order to national law, is of no importance between these parties. That the facts brought the case within the order is clear, because it was so held in this very case, and has been so held repeatedly since. The *Immanuel* (d). The *William* (e). It was justly so held. The voyage was a *direct* one from *Spain* to the mother country; not in *course*,

1814.

KOHNE
v.
INS. COMPANY
of
N. AMERICA.

(a) 8 *Mass. Rep.* 336.
(b) 1 *Condy's Mar.* 473.
(c) *Ibid.*

(d) 2 *Rob.* 169.
(e) 5 *Rob.* 349.

1814.

KOHNE
*v.*
INS. COMPANY
of
N. AMERICA.

but in *plan*. The documents proving the *Spanish* origin of the cargo were on board, to be used in *Spain*. There was no importation in the *United States*, no *landing* according to the case of The *Polly*, (*a*) to break the continuity of the voyage, or to shew a *bona fide* intention of terminating the voyage in the *United States*. The permission by the custom house officers to retain the cargo, was unwarranted by law; there can be no importation without landing; the officers can not execute their duty without landing. 1 *U. S. Laws* 185. 193. 209. 211. 231. 233, 234. This which is called an importation, was therefore an illegal act, which neither our own nor foreign courts can respect. But if legal, it was at least novel. It was unknown in many parts of the *United States*. It was calculated to excite suspicion, and therefore to these defendants who knew nothing of the practice of *Charleston*, it ought to have been communicated. The assured cannot say that the underwriters were bound to enquire into this, or the history of the voyage. Not into this, because *Charleston* was not mentioned to them. *Newport* was the place of departure. Nor into the voyage, because, though the articles insured were mentioned, nothing was said of their origin, or of the ship in which they came. These were facts within the private knowledge of the assured, about which underwriters are not bound to enquire, *Parkin* v. *Dick* (*b*); not public transactions, foreign laws, or the course of trade, which it is their duty to know. It is clear beyond doubt, that had the defendants known the facts that were withheld, they would have declined the risk, or asked a higher premium. In *Lynch* v. *Dunford* (*c*) the policy was held void, because material intelligence respecting the risk was not communicated, although it turned out to be false.

*Levy* and *Rawle* for the plaintiff. It was left to the jury to decide, whether the facts not communicated, were material to the risk, and on this they have passed in our favour. They have also passed upon the question, whether there was not a sufficient disclosure to put the defendants upon enquiry. Their verdict ought not to be disturbed. In *Williams* v. *Delafield* (*d*), the judge was of opinion that there was a

(*a*) 2 *Rob.* 295.          (*c*) 14 *East* 494.
(*b*) *Campb.* 221.          (*d*) 2 *Caines* 329.

material concealment, but the jury found the contrary, and a new trial was refused. In *Long* v. *Duff* (a), it was left to the jury to decide, whether according to usage, it was the duty of the insurer to enquire into certain facts, and a new trial was refused.

The facts if concealed were not material, because they did not bring the case within the true construction of the order of *January* 1798. What the subsequent decisions of the *English* admiralty have been, is of no importance; they had not occurred prior to this insurance. The only point is, what will this Court say the construction is; or in other words, what is in truth and fair reasoning a *direct* voyage from the colony to the mother country. Every voyage is direct in which there is no *intermediate* port between the *termini*; a voyage is indirect in which there is such an intermediate port. Here was the intermediate port of *Charleston*, where there was an importation to satisfy our own law, and also the *British* decisions. Our own law, because there is no legal necessity for landing a cargo, that has been entered for exportation; nor is it practised except to test the weights in case of suspicion. 1 *Laws U. S.* 188. *sec.* 9, 10. 16. 26. 29, 30. The *British* decisions, because by them the spirit of the order is to incumber the goods with the burden of duties and additional freight, and the inconvenience of greater delay. *The Immanuel* (b). *The Polly* (c). Goods may be imported in the legal sense, though not landed. *Leiper* v. *Smith* (d). Discharging from one ship into another in *corpore comitatus*, is an importation. 12 *Co.* 18. Freight, duties, delay, all attended this case as much as an actual landing. The admiralty of *England* is not satisfied with landing. *The William* (e). Every thing is in that Court, but mere evidence of intention; and in our case the intention *bona fide* to import, is inferible from landing part of the cargo, and afterwards adopting the voyage in question. On this the jury have also passed. The *Spanish* papers on board, served as certificates of origin to prevent captures by the *French*.

But the facts were not concealed, because it was the duty of the underwriters to take notice of them, or to make

(a) 2 *Bos. & Pul.* 209.  (c) 2 *Rob.* 301.  (e) 5 *Rob.* 319.
(b) 2 *Rob.* 169.  (d) *Bunb.* 79.

1814.

KOHNE
*v.*
INS. COMPANY
of
N. AMERICA.

enquiry. As to the mode of importing at *Charleston*, they were bound to know the custom of that place; and as to the origin and history of the cargo, they must have known that it came from a *Spanish* colony, and was going to *Spain*. If it concerned them to know in what vessel imported, and whether landed or not, there was sufficient told them, to lead to enquiry.

TILGHMAN C. J. after stating the facts, and the manner in which he left the cause to the jury, delivered his opinion.

The plaintiff's counsel contend, that the cause having been submitted to the jury on a point of fact, their verdict ought not to be set aside. If it had been submitted on a matter of pure fact, yet if it clearly appeared to the Court that the jury were mistaken, it would be their duty to grant a new trial. But although in compliance with the usual practice, I left it to the jury to decide, whether circumstances material to the risk, had been concealed by the plaintiff, yet in truth in this decision were involved both law and fact. Whether the circumstances were or were not communicated was matter of fact, but the materiality of the circumstances depended in part on considerations of law. As there was no evidence that the circumstances alluded to had been communicated, there could be no reasonable doubt on that head. But it has been said, that it was the business of the defendant to make enquiry, because being told that the cargo consisted of articles the growth of *Spanish America*, he was put on his guard, and ought to have enquired how they came to *Newport*. Whether this enquiry ought to have been made by the defendants, appears to be rather matter of law, and I think they were not bound to make it. They had a right to presume, unless informed to the contrary, that the cargo was of such a nature as might be carried from *Newport* to *Port Passage*, without being subject to capture, in consequence of facts, resting in the private knowledge of the plaintiff. Of the *British* orders in council of the 25th of *January* 1798, under which the condemnation took place, it may be fairly presumed that both parties had notice, because both were too much conversant in business leading to that kind of knowledge, to be supposed to remain in ignorance of such an important state paper, which had been so

long promulgated. And besides this general presumption, there was proof of so great an anxiety in the plaintiff to have the insurance effected, as can only be accounted for from his consciousness of the risk he was running. Let us see then, what these orders in council were, and how the case of the plaintiff was affected by them. They contained instructions to the *British* cruizers, to seize and bring in for adjudication, all ships laden with goods, the produce of *French*, *Spanish*, or *Dutch* colonies, and going *directly* from thence to any port in *Europe* not *English*, nor the port of that country to which the ship belonged. The question turns on the word *directly*. The *Gadsden*, says the plaintiff, was not going *directly* from *Laguira* to *Port Passage*, because her cargo was first imported into *Charleston*. It must be premised, that with respect to the insurer and insured, it is of no importance, whether the *British* orders in council were conformable to the law of nations or not. Between these parties, the object is an indemnification from loss occasioned by capture legal or illegal. We have only to consider then, what construction the *British* courts would put on the orders in council. We know very well, what the construction has been in cases decided since the making of this insurance. The *British* courts have held, that the *directness* of the voyage from the *Spanish* colony to the mother country is not broken, but by a *bona fide importation* into the *United States*; and there is no instance of any importation having been deemed *bona fide*, without *landing* the goods. For this I refer to the cases of the *Immanuel*, 2 *Rob*. 169., and the *William*, 5 *Rob*. 349. But it is objected by the counsel for the plaintiff, that although the law is now held so, yet there had been no decision to that effect at the time of making this insurance, and therefore that the plaintiff had nothing but the orders in council themselves for his guide. Taking it so, what is the fair meaning of those orders? Going *directly*, does not mean going in a *direct course;* that would be an absurd construction, for then nothing would be necessary to evade the order, but going a little out of the direct course. The meaning is, going in a *direct voyage*. The voyage may be direct and the course indirect. Whether the voyage is direct, is a matter of fact to be determined from the circumstances of the case. If the circumstances

warrant the conclusion, that a voyage from the colony to the mother country was the *real intent*, the case falls within the penalty of the orders, whatever means may have been taken to conceal the truth. But the intent is generally to be judged of by *actions*, for it is seldom that the *confession* of the party is to be had. No rule is more reasonable than this. " Where the goods have been completely imported into the " *United States*, so as to become part of the stock of the " nation, the voyage from the *Spanish* colony is broken, and " on exportation from the *United States*, a new voyage shall " be said to be commenced." I do not think it necessary to decide, whether such an importation can be made without landing, by consent of the custom house officers, although I am inclined to the opinion, that such a practice was a departure from the intent of the law. There was proof, that in *Charleston* permission was given for several years, to retain cargoes on board which were intended for exportation. But this seems to have been matter of favour and indulgence; nor is there any evidence that such a practice prevailed throughout the *United States*, or in the city of *Philadelphia*, where the policy was underwritten. The question however is, whether the defendants had any reason to suppose that the goods had not been landed in the *United States* for the purpose of importation, and whether the not landing would not expose the ship to greater danger of capture from a *British* cruizer, in case she was met by one, than if they had been landed. Upon these points I see no reason to doubt. The bare touching at *Charleston*, and bonding for duties which were drawn back on exportation, could never remove the suspicion, that the touching was to afford a pretence for saying that the direct voyage was broken. If it gave just cause for suspicion, it increased the risk, and the defendants ought to have been told of it. I do not see then how this verdict can be supported, unless by assuming that in *Phila-delphia*, where the insurance was effected, it was known to the underwriters that importations were made sometimes with landing and sometimes without landing, and also that it was usual there to take the same premium in both cases. But as no evidence was given to warrant such an assumption, on the contrary evidence having been given that the defendants had not knowingly taken such a risk, I am of

opinion that the verdict should be set aside, and a new trial granted.

YEATES J. I have read the charge of the Chief Justice to the jury in this cause, and considered attentively the arguments of counsel on the motion for the new trial. I entirely assent to the charge for the reasons therein given, which it would be a waste of time to repeat.

The *British* Orders in Council of 25th of *January* 1798, were well known in the *United States* in 1799. I cannot bring my mind to doubt, that if in *October* 1799 two risks were offered to underwriters, one of goods, the produce of a *Spanish* colony, coming from those colonies immediately to a port in the *United States*, and there fairly landed and the duties paid, upon a voyage to *Spain*,—and the other upon the same goods where they had not been landed, such underwriter would view the latter case as an increase of risk, though no judicial decision had passed on the subject.

I therefore consider the verdict against law, for the want of disclosure of a material fact known to the insured alone, and that a new trial should be granted.

BRACKENRIDGE J. Was there an importation in this case? Is not this a conclusion of law from facts? The facts seem to be admitted on both sides. The conclusion of law was drawn by the Court, whose opinion would seem to have been, that an *importation* according to law had not taken place. Whether this was material to the risk, was a conclusion of law from facts. The facts depended upon orders of council, instructions to armed vessels &c., and were not in dispute. The conclusion of law in the opinion of the Court would seem to have been that this was *material* to the risk, and if so, the facts from which the conclusion of law as to *impor-tation* was to be drawn, ought to have been communicated to the insurer, and of that opinion I am, and that this verdict therefore is against law and the charge of the Court, and that a new trial ought to be granted. When it comes to a new trial, the facts being admitted, as in the argument of the case they would seem to have been, but two questions will remain to be decided, and the determinations of these will be against the plaintiff, so that he cannot recover.

Call the question of *importation* in this case a question of

1814.

KOHNE
v.
INS. COMPANY
of
N. AMERICA.

fact, it must be subject to the direction of the Court what will amount to an importation in this case, and this will be a *construction of law.* Call it a question of fact, whether the concealment in this case was that of a fact material to the risk, it will be subject to the direction of the Court whether *material,* and might be put to the Court by the jury to say, whether the matter concealed varied the risk, as a question of law arising from the facts. Putting myself in a situation at the trial as bound to answer these questions, I would have told the jury, that there had not been an importation for the purpose of legal exportation, so as to break the continuity of the voyage, and render its parts distinct; and that this materially affected the risk, and ought to have been communicated, which not having been done, it was a *suppressio veri,* and in contemplation of law a fraud, and vacated the policy *ab initio,* so that no recovery could be had in the case.

I concur as to its being the duty of the insured, to have communicated the facts *as to the importation,* and that it did not lie with the insurer to enquire, notwithstanding there might have been something from the nature of the cargo to put him upon enquiring.

The voyage in this case was a *direct* voyage, a *bona fide* importation not having taken place. I lay any indulgence or custom of collections in ports out of the case. The law can know nothing of this, as to the question of a *bona fide* importation.

New trial granted.